Filed 7/31/24  In re L.L. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.L., a Person Coming Under the Juvenile Court Law. | D083537 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J521208) |
| Plaintiff and Respondent, | |
| v. | |
| A.L., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa Maldonado, Chief Deputy County Counsel, Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

Then three-month-old L.L. became a dependent of the juvenile court because of physical abuse by her mother, A.L. (Mother). At the six-month review hearing, the juvenile court placed L.L. with D.L. (Father) and found L.L. would suffer detriment if returned to Mother's care. On appeal, Mother contends the court's detriment finding was not supported by substantial evidence. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Facts Leading to the Dependency Case*

In early 2023,[1] Mother shook newborn L.L. on multiple occasions. On one occasion, she took L.L. out of her car seat and shook her strongly because she was crying. On another occasion, Mother shook L.L. and slapped her across the face because she was crying while the parents argued. Then, the parents were on a video call when Mother tossed L.L. two to three feet across a bed, causing L.L. to turn 180-degrees, and hit her head on a cell phone.

Toward the end of March, Father informed Mother he wished to end their relationship.[2] In response, Mother screamed and ripped out her own hair, and she repeatedly expressed a desire to commit suicide. Father took Mother to the hospital where Mother admitted to hospital staff that she shook and threw L.L.

Following the advice of hospital staff, Father took three-month-old L.L. to the hospital. Father reported that Mother shook L.L. several times over a period of weeks and that he believed Mother was overwhelmed in caring for L.L. He reported Mother was also abusive toward him and that L.L. was present during some of their physical altercations.

---

[1]    All undesignated date references are to 2023.

[2]    Father is not a party to this appeal and will only be referenced when necessary.

2

Hospital staff reported that Mother had symptoms of anxiety, depression, self-harm, and impulsive behaviors. Mother's abuse of L.L., however, was not directly caused by mental illness, but rather by her impulsivity and poor decision making when facing psychosocial stressors.

Mother reported that she did not take L.L. to the hospital because she believed L.L. was "fine." She nevertheless acknowledged that she shook L.L. after losing control of her emotions and that she felt unsafe around L.L. because she worried her behaviors could recur.

B.      *The Agency's Petition and Detention Hearing*

In early April, the San Diego County Health and Human Services Agency (Agency) filed a petition on L.L.'s behalf due to Mother's mental health and physical abuse and detained L.L. in a licensed foster home.

At the detention hearing, the juvenile court appointed counsel for the parents and for L.L. The court found L.L.'s petition met prima facie requirements and detained her in out-of-home care. It ordered supervised visits for the parents and vested the Agency with discretion to expand their visitation.

C.      *The Agency's Jurisdiction-Disposition Report*

At the end of April, the Agency reported that Mother took accountability for the facts underlying L.L.'s petition, although she denied she shook L.L. more than once. She claimed that she shook L.L. due to feeling frustrated with Father. After L.L.'s birth, she started acting aggressively toward Father because she felt she was solely responsible for the home and L.L.'s care. In response, Father sought childcare for L.L. and obtained a restraining order against Mother.

Mother reported she was being treated by a psychologist and a psychiatrist. While her psychologist mentioned postpartum depression, she

had diagnoses of depression and anxiety. The social worker encouraged Mother to speak to her primary care provider about postpartum depression. Mother was not on medication and did not want to take medication.

Mother's case plan included participation in domestic violence and child abuse groups, as well as a parenting education program. It also recommended that she attend all mental health appointments and comply with her provider's recommendations.

D.    *Jurisdiction-Disposition Hearing*

At the jurisdiction-disposition hearing, the Agency reported it had detained L.L. with a maternal great-aunt. The court found L.L.'s petition true and set disposition for trial.

At the contested disposition hearing in May, Father informed the juvenile court that he had withdrawn his restraining order against Mother. The court removed L.L. from the parents, placed her with the maternal great-aunt, and vested the Agency with discretion to allow the parents to visit together.

The Agency's addendum report noted L.L. adjusted well to the maternal great-aunt's care. Mother visited L.L. five times per week for six hours each visit. The Agency expanded Mother's visits to unsupervised visits.

E.    *The Agency's Six-Month Review Report and the Initial Hearing*

The Agency's November report in advance of the six-month review hearing noted both parents had completed a parenting education program. Mother received daily support from the maternal grandfather, who lived next to her.

The Agency had concerns about Mother harassing Father during the reporting period. She called and texted him incessantly despite his request

4

that she stop.  In July, he filed for a temporary protective order against Mother, and she did not contact him when it was in effect.  A couple weeks later, however, Father terminated the protective order and the parents reengaged in communication.

The social worker advised Mother to focus on L.L. during her visits instead of calling Father.  Despite this, Mother called Father during a September visit and was dishonest about her failure to follow the social worker's advice.  Otherwise, her visits with L.L. were successful and she actively engaged with L.L. and attended to her needs.  The Agency initially referred Mother for coaching because she struggled to feed L.L. during visits.  Her coach gave her positive reports, and Mother researched recipes and provided L.L. with homemade food.

In October, Father filed a report with the police department claiming that Mother continued to harass him.  Mother acknowledged she called and harassed Father until he "bl[e]w[ ] up" at her.  The social worker expressed concern that Mother focused on Father instead of reunifying with L.L.  Mother acknowledged that her decision making was irrational and that she distanced herself from her reunification goals when she engaged with Father.

The Agency recommended that the parents receive reunification services to the 12-month review hearing date.  In making this recommendation, the Agency wanted Mother to progress in her child abuse classes and to demonstrate more insight about the incidents that caused L.L.'s removal.

At the six-month review hearing in November, Father set the matter for trial.  Mother submitted on the Agency's recommendations and did not join in Father's trial set.

F.    *The Agency's Addendum Reports*

The Agency's addendum report noted concerns about the parents' contact during the reporting period. On one day in December, Mother called Father 14 times, while he called her seven times. Mother told the social worker that L.L. accidentally called Father on Mother's tablet during a visit. Later, Mother admitted this was a lie and that she had facilitated Father's video visit with L.L.

As of November, Mother self-reported enrolling in an additional parenting class. She also began overnight visits at her home. She admitted facilitating video calls between L.L. and Father during her own visitation time. When asked why she went against the social worker's advice, Mother reported she did not believe she would get caught. Mother changed her phone number at the social worker's request.

The social worker informed the parents that the Agency intended to recommend no contact between them. She was concerned about the parents' lack of boundaries with each other, and she wanted them to learn how to successfully coparent.

In a subsequent addendum report, the Agency noted that Mother's overnight visits occurred without issue. She reported she kept her contact information confidential from Father. The Agency confirmed its prior recommendation, but additionally recommended that both parents receive overnight visits. It still had concerns about the parents' lack of coparenting skills. They had not demonstrated an ability to communicate in a healthy manner, which called into question their ability to resolve parenting-related issues.

G.  *Contested Six-Month Review Hearing*

At the January 2024 contested six-month review hearing, the parents were present.  The juvenile court received the Agency's reports into evidence.

Mother's providers reported that she made good progress in her services.  None of them recommended that she undergo further psychological assessments or treatments.  Mother also never cancelled a visit due to her mental health.  Mother argued that L.L. would not be placed at substantial risk of detriment if returned to her care.

The social worker believed the parents continued to focus on conflict within their relationship.  Before recommending placement, she wanted them to instead focus on L.L.'s needs.  L.L. was at risk of future harm until the parents moved on from issues within their relationship.

L.L.'s attorney agreed with the Agency's recommendations.  She argued L.L. would be placed at substantial risk of detriment if returned to the care of either parent.

H.  *The Court's Ruling*

In January 2024, the juvenile court concluded that return of L.L. to Mother would create a substantial risk of detriment to her safety, protection, and/or physical or emotional well-being.

The court further found that return of L.L. to Father would not create a substantial risk of detriment to L.L.  The court ordered that L.L. be placed in Father's care, with Mother's overnight and unsupervised visitation to be arranged in a child and family team meeting.  The court also ordered no contact between the parents, except when they communicated through a parenting application, and that the parents participate in mediation.  It continued its jurisdiction and ordered further services for the parents.

7

## DISCUSSION

### I.

### *Relevant Legal Principles*

When the juvenile court has found jurisdiction under section 300, it may remove a child from a parent pursuant to section 361 at a *dispositional hearing* only if it finds by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents." (§ 361, subd. (c)(1); see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 (*Cynthia D.*) ["At the dispositional hearing, the standard of proof for removal from a custodial parent is clear and convincing evidence."].)

In contrast, at the six-month review hearing, there is a statutory presumption that the child will be returned to parental custody "unless the court finds, by a *preponderance of the evidence*, that the return of the child to [his or her] parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1); *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483 (*Mary B.*).) The Agency, not the parent, bears the burden of establishing that detriment. (*Cynthia D.*, *supra*, 5 Cal.4th at pp. 248–249.) Proof by a preponderance standard at this stage sufficiently protects a parent's due process rights because, as our Supreme Court has explained, the statutory scheme requires the juvenile court to have previously made a finding of detriment by clear and convincing evidence. (*Cynthia D.*, at pp. 253–256.)

"In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services" and "efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) The juvenile court "shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided . . . ." (§ 366.21, subd. (e)(1).)

A juvenile court may find it is detrimental to return the child to the parent even if the parent has complied with the reunification case plan. (See *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704–711 [concluding that, although Mother had completed her program, reports by mental health and medical professionals and social worker supported the finding that returning the minors to Mother would be a substantial detriment to them]; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 [holding that therapy attendance and visiting the children were not determinative, and that "[t]he court must also consider the parents' progress and their capacity to meet the objectives of the plan"]; *Ibid.*; *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1221 ["a finding that improvements in [a] parent[']s circumstances outweigh the failures during reunification does not guarantee return of the child to the parents"].) The juvenile court may consider the parent's past conduct as well as present circumstances (*In re Troy D.* (1989) 215 Cal.App.3d 889, 900), and is permitted to consider a parent's denial of the protective issues when evaluating detriment in returning a child to parental custody (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865–868 (*Georgeanne G.*)). "It is for the [juvenile] court to weigh [evidence of present circumstances] against the evidence of the parents' efforts, accomplishments, and failures during the reunification period." (*In re Jonathan R.*, at p. 1221.)

9

"We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination." (*Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 864–865; see *Mary B.*, *supra*, 218 Cal.App.4th at p. 1483.) " ' "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' [Citation.] ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

## II.

### *Substantial Evidence Supports the Court's Finding of Detriment*

Mother contends that the juvenile court's finding at the six-month review hearing that it would be detrimental to return L.L. to her custody is not supported by substantial evidence. We disagree. On this record, there was substantial evidence to support the court's finding of detriment.

Here, the court found it would be detrimental to L.L. to return her to Mother's custody at the six-month review hearing because jurisdiction was "first based" on "Mother's physical abuse" to L.L., Mother was only halfway through her domestic violence group sessions, she "minimiz[ed] the harm" she caused to L.L. and she "continue[d] to lack insight into the protective issue as evidenced not only from the statements of the provider but the Mother, herself." She also became "upset" when communicating with Father and, "until recently, the parents have continued to engage[ ] in verbal altercations via telephone, which . . . was the last setting that led . . . Mother

10

to shake and throw [L.L.] onto the bed." Substantial evidence supported these findings.

The record before the juvenile court at the time of the six-month review hearing revealed that Mother had attended 16 child abuse classes and missed six classes. She had 36 classes remaining and had already "reached the maximum number of absences she can have in the program." She scored a 3 in the areas of empathy and insight, which stands for "sometimes" in the rating scale. She "need[ed] improvement in understanding the fear and trauma the abuse causes and showing insight concerning abusiveness and its effects on partner and children." The instructor was still working with her on empathy, insight, minimization, and denial.

Mother also completed only half of her domestic violence treatment classes, which was significant because the parents' domestic violence dynamic precipitated Mother's physical abuse. For example, L.L. cried because the parents were arguing, which caused Mother to shake L.L. and slap her across the face. On another occasion, Mother tossed L.L. after she screamed at Father on the phone. Mother also slapped Father while he held L.L. on several occasions. The court was correct to consider how much "progress" Mother made in her treatment program when determining whether it would be detrimental to return L.L. to Mother's custody. (§ 366.21, subd. (e)(1).)

Additionally, the Agency was aligned with the child abuse instructor's assessment that Mother "continue[d] to minimize the incident that brought [L.L.] into care." Although Mother accepted that she threw and shook L.L.,

she stated " 'nothing happened' " to L.L.[3]  She also reported that her actions constituted an involuntary response to the stress she felt in dealing with Father.  Mother's minimization of the protective issues further supported the court's finding there is detriment in returning L.L. to her custody.  (See *Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 865–868.)

It is Mother's burden to affirmatively demonstrate the juvenile court's order was not supported by substantial evidence (*In re J.F.* (2019) 39 Cal.App.5th 70, 79), but her arguments on appeal—that she "excelled in all aspects of her case plan," that her interaction with L.L. was "uniformly positive," and that the "parents' termination of their relationship allayed any remaining concerns about" L.L.'s safety—are not adequate to carry that burden.  Mother overlooks that under the substantial evidence standard of review, we do not disturb the court's findings if it is supported by substantial evidence, "even though substantial evidence to the contrary also exists and the [juvenile] court might have reached a different result had it believed other evidence."  (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 230.)

Moreover, we do not agree with Mother that the parents' relationship no longer poses a concern for L.L.'s safety.  During the case, Mother contacted Father in hopes of reinstating their romantic relationship.  She was sometimes dishonest about her contact with him and used her visitation time to call him despite being advised not to do so.  The parents remained in contact until less than two months before the contested hearing.  They reignited contact with each other after Father obtained protective orders against Mother or changed his phone number to prevent her from contacting

---

3     Meanwhile, a child protection doctor noted that shaking an infant could cause the infant to suffer brain injuries, intracranial hemorrhages, retinal hemorrhages, seizures, apnea, coma, and, in severe cases, death.

12

him. This caused the social worker to question whether the parents' cessation of contact would last.

For support, Mother cites *Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 865–869, *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*) and *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646 (*M.G.*), but none of those cases demonstrates that the court erred in this case. In *Georgeanne G.*, the court rejected the parent's claim that "lack of insight is not a valid ground for finding [the child's] return to [the parent's] home would create a substantial risk of detriment to [the child's] safety or physical or emotional well-being." (*Georgeanne G.*, at p. 865.) After discussing several cases, including *Blanca P.*, the court concluded that "[n]one of these cases holds a parent's lack of insight may not be considered by the juvenile court," so long as the evaluation of the parent's insight is " 'based on *evidence* rather than an emotional response.' " (*Georgeanne G.*, at p. 867, citing *Blanca P.*, at p. 1750.) In *M.G*, the court "based its concerns on a hunch that was not supported by any evidence." (*M.G.*, at p. 662.) The Agency there also "failed to articulate specific reasons why or how the child[ ] would be at risk if placed in Mother's . . . care." (Cf. *id*. at pp. 661–662.)

We reject Mother's contention that the juvenile court's findings and order were based on speculation, conjecture, or unreasonable inferences. (Cf. *Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 868–869; *Blanca P.*, *supra*, 45 Cal.App.4th at pp. 1750–1751; *M.G.*, *supra*, 46 Cal.App.5th at pp. 661–662.) Instead, the evidence showed that Mother's repeated pattern of engaging in domestic violence precluded her from protecting L.L. and placing L.L.'s needs above her own. The evidence also established that Mother had not made sufficient progress in her case plan to substantially lessen this risk. She also failed to gain adequate insight into the issues that placed L.L. in

danger, and the court found this failure led to a risk of harm to L.L. These facts are substantial evidence to support the juvenile court's detriment finding at the six-month review hearing. (§ 366.21, subd. (e)(1); *Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 865–869.) Accordingly, we affirm the court's decision.

## DISPOSITION

The juvenile court's findings and orders of January 29, 2024, are affirmed.

KELETY, J.

WE CONCUR:


BUCHANAN, Acting P. J.


RUBIN, J.

14